**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CARLTON ENERGY** | § | |
| **GROUP L.L.C.** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:13-CV-** |
| | § | **00095** |
| **CLIVEDEN** | § | |
| **PETROLEUM** | § | |
| **COMPANY LIMITED** | § | |
| **and CLIVEDEN** | § | |
| **PETROLEUM SA** | § | |
| **Defendants.** | | |

**CARLTON ENERGY GROUP L.L.C' S SECOND AMENDED COMPLAINT**

I.        Parties

1.        Plaintiff, Carlton Energy Group L.L.C. ("Carlton"), is a limited liability

corporation that is organized under the laws of the State of Texas and has its principal

place of business in Houston, Texas.

2.        Defendant Cliveden Petroleum SA ("Cliveden SA"), a business entity organized

under the laws of Switzerland, was the operating arm of Cliveden Holdings, Ltd., which

was the parent company of Cliveden Petroleum Co. Ltd., the owner of 100% of the

working interest in an oil and gas concession covering 108,000,000 acres in the Republic

of Chad, and actively controlled the operations of Cliveden Petroleum Co. Ltd. until

2006.  Cliveden SA has appeared and answered and no further process is necessary.

3.        Defendant Cliveden Petroleum Co. Limited ("Cliveden"), is a subsidiary of

CNPC International (Chad) Ltd. ("CNPC Chad"), which in turn is a subsidiary of

PetroChina Company Limited.  Cliveden entered into the agreement with Carlton that is

the basis of this lawsuit.  Cliveden has appeared and answered and no further process is necessary.

4.      Defendant  China National Petroleum Corporation ("CNPC"), an agency or instrumentality of the foreign state of The People's Republic of China, has filed to do business in the State of Texas and maintains an office in Houston, Texas.  CNPC may be served through its registered agent, Li Haulin at 1080 Houston Ave., Ste 240, Houston, TX 77007.  CNPC is a parent company of PetroChina Company Limited, CNPC Chad, China National Oil and Gas Exploration and Development Corporation ("CNODC"), CNPC Exploration and Development Limited ("CNPC E&D") and Cliveden.

5.      Defendant PetroChina Company Limited ("PetroChina") operates in the United States and conducts business in Houston, Texas.  PetroChina indirectly owns at least 10% of the stock in CNPC Chad.  PetroChina, a foreign corporation organized and existing under the laws of the State of The People's Republic of China, whose home office is located at 9 Dongzhimen North Street, Dongcheng District, Beijing, China, 100007, may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Austin, Texas 78701, as its agent for service because PetroChina engages in business in Texas but does not maintain a regular place of business in Texas or a designated agent for service of process, and this suit arose from defendant's business in Texas.  PetroChina does maintain a registered agent in New York, CT Corporation System, located at 111 Eighth Avenue, New York, New York 10011.

II.      Jurisdiction

6.      This Court has personal jurisdiction over each Defendant because they purposely availed themselves of the privileges and benefits of conducting business in Texas.

2

Defendants had sufficient minimum contacts with the State of Texas and its residents to warrant being subject to this State's jurisdiction.  To exercise personal jurisdiction over Defendants and require them to defend a suit in the State of Texas would not insult the traditional notions of fair play and substantial justice.  For example:

- CNPC maintains an office in Houston and regularly conducts business in Texas;

- Cliveden maintained an office in Houston during the times relevant to this suit;

- Cliveden entered into an agreement with Carlton that: (i) required Carlton to perform specific actions in Houston, Texas; (ii) was explicitly governed by Texas law; and (iii) specified any legal actions would take place in state or federal courts in Harris County, Texas;

- CNPC, CNPC Chad, CNODC, CNPC E&D, and PetroChina are successors to the rights and obligation established by that agreement;

- CNPC, CNPC Chad, CNODC, CNPC E&D, and PetroChina have all accepted the benefits provided by Carlton under the agreement;

- All defendants have been part of an ongoing series of wrongful acts that have taken place in Harris County that have harmed Carlton; and

- The defendants are all alter egos of each other and have benefited from the wrongful acts that have taken place in Harris County and harmed Carlton.

### III.   Venue

7.    Venue is proper in this district because the parties agreed to handle any legal issues in state or federal courts in Harris County, Texas.  In addition, venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Defendant CNPC is a resident of Texas and maintains an office in Harris County, Texas.

### IV.   Conditions Precedent

8.    All conditions precedent have been performed or have occurred.

V.     Facts

**A.     Overview.**

9.     In 2000, Cliveden acquired a 100% working interest in an oil and gas concession in the Republic of Chad covering 108 million acres, an area approximately the size of France (the "Concession" also known as "Block H").  At the same time, Carlton received a 10% carried net profits interest in Cliveden.  The Concession has since proven to be extremely valuable with estimates that at least a billion barrels of oil are in place.  Thus, the Concession's value is not mere speculation.  CNPC, through its subsidiaries, paid hundreds of millions of dollars to gain control over both Cliveden and the Concession.  CNPC has drilled well over 100 wells and has already achieved production sufficient to justify construction of a 300 km pipeline and refinery capable of refining 20,000 barrels of oil per day.  Yet, neither Cliveden nor CNPC (or the subsidiaries CNPC used to acquire Cliveden and maintain the Concession) have paid Carlton its 10% net profits payment.  Instead, CNPC has taken over Cliveden, stripped it of its assets without consideration and has tried to force Carlton out.  To accomplish the force out, CNPC has consistently refused to pay Carlton its net profits interest and refused to provide contractually required financial information about Cliveden to allow Carlton to determine the amount it is owed for its 10% net profits interest.

10.     Plaintiff, Carlton, asserts claims for breach of contract, anticipatory breach of contract, fraudulent transfer, oppression, unjust enrichment, and alter ego liability against the Defendants identified below (collectively, "Defendants"), arising from Defendants' acquisition, control, and management of oil and gas operations in the Republic of Chad.

11.     Carlton's claims are made on information and belief (except as to allegations specifically pertaining to Carlton, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Carlton's counsel. That investigation included reviewing and analyzing information concerning Defendants that Carlton (through their counsel) obtained from, among other sources: (i) online legal database searches; (ii) publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); (iii) filings Defendants made with the United States Securities and Exchange Commission ("SEC"); and (iv) court documents submitted in prior lawsuits.  These information sources collectively support Carlton's allegations.

12.     Except as alleged in this Second Amended Complaint, neither Carlton nor other members of the public have access to the underlying facts relating to Defendants' improper activities. Rather, that information lies exclusively within the possession and control of Defendants, which prevents Carlton from further detailing Defendants' misconduct.  Carlton thus believes further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

**B.     Carlton and Cliveden enter into the Assignment Agreement.**

13.     In 1999, the Republic of Chad ("Chad"), Trinity Energy Resources, Inc. ("Trinity"), Oriental Energy Resources, Ltd. ("Oriental"), and Plaintiff Carlton entered into an agreement whereby Carlton, Trinity, and Oriental were given an exclusive concession to explore and develop oil and gas fields across three regions in Chad covering approximately 108,000,000 acres (the "Concession" or "Block H").  Trinity was

designated the operator and given a 70 % working interest.  Oriental retained a 20%

working interest and Carlton a 10% carried working interest.

14.     Trinity, however, was unable to explore or develop the Concession, and Trinity

assigned its interest to Cliveden in late 1999 or early 2000.  At that point Cliveden owned

a 70% working interest and became the operator of the Concession.

15.     Around that same time period, Cliveden called for a capital contribution from

Oriental.  Oriental was unable to meet the demand and Cliveden assumed Oriental's

interest giving it a 90% working interest in the Concession.

16.     On March 31, 2000, Carlton and Cliveden entered into an agreement whereby

Carlton assigned its 10% carried working interest in the Concession to Cliveden

("Assignment Agreement").  The parties executed the Assignment Agreement in

Houston, Texas.  In return, Cliveden granted to Carlton a carried, undivided 10% interest

in the distributable net profits of Cliveden.  The Assignment Agreement also required

Cliveden to assume a debt of $500,000 owed to Carlton by Trinity and required Cliveden

to pay the debt in full once Cliveden recouped its investment costs in the Concession.

The parties characterized that amount as an assignor fee.   As additional consideration for

the assignment, the Assignment Agreement required Cliveden to pay Carlton $10,000 per

month for the opportunity to utilize Carlton's offices in Houston and to receive support

from Carlton for technical and commercial work undertaken by Cliveden.  It also

required Cliveden to reimburse Carlton for reasonable out of pocket costs expended by

Carlton on behalf of Cliveden.  A copy of the Assignment Agreement is attached as

Exhibit A.

17.     The Assignment Agreement contained express terms on how the parties intended the carried net profits interest to be calculated, reported and paid to Carlton. The Assignment Agreement required Cliveden to deliver Carlton, within forty-five (45) days after the end of each calendar quarter, a statement of distributable net profits prepared in accordance with generally accepted accounting standards consistently applied, setting forth the computation and determination of distributable net profits of Cliveden for the previous calendar quarter, along with payment of the amount of net profits owed to Carlton. Specifically, the Assignment Agreement stated:

> An amount equal to ten percent (10%) of the distributable net profits of Assignee [Cliveden or its successor], determined on a quarterly basis during each calendar year, shall be paid and distributed to Assignor [Carlton] by Assignee within forty-five (45) days after the end of each calendar quarter, accompanied by a statement of distributable net profits prepared by or under the direction of management of Assignee setting forth the computation and determination of distributable net profits of Assignee for the previous calendar quarter.

The Assignment Agreement defined "distributable net profits" as:

> the net income of Assignee [Cliveden or its successor] from earnings and receipts from operations, fees, and disposition of assets, including without limitation, royalties and bonuses, before income taxes, interest on indebtedness, depreciation, and amortization, less all costs and expenses of operations (excluding salaries of directors, principals or interest owners), administration, sales, severance, and production taxes, and similar burdens, and all costs hereto or hereinafter incurred by Assignor [Carlton], including third-party costs with respect to the Convention and other properties, and all investment, exploitation costs and expenditures, whether capitalized or expensed for bookkeeping and accounting purposes, determined on a cash basis, and otherwise in accordance with generally accepted accounting standards consistently applied.

18.     At or near the beginning of 2000, Carlton began providing support and office space to Cliveden.

19.     On or around February 26, 2002, Cliveden sold an undivided 50% of its interest in the Concession to Encana International (Chad) Ltd. ("Encana Chad"), an indirect subsidiary of Encana Corporation ("Encana"), for $46,500,000.  Encana Chad then became the operator of the Concession.  Neither Cliveden nor EnCana Chad have provided any financial information about that transaction or made any payment to Carlton for its 10% net profits interest or for the $500,000.00 assignor fee.  Instead, Cliveden has consistently maintained that no net profits have been realized and that its investment has not been recouped.

**C.     CNPC Acquires Cliveden and the Concession.**

20.     CNPC is an integrated international energy company.  Originally based in China, CNPC now has oil and gas assets and interests in 33 countries in Africa, Central Asia-Russia, South America, the Middle East and the Asia-Pacific.  CNPC manages those assets through many wholly owned and partially owned subsidiaries that CNPC controls and directs.

21.     CNPC acquired and maintained control over Cliveden and the Concession by relying on at least four separate subsidiaries, which CNPC controls: CNODC, PetroChina, CNPC E&D, and CNPC Chad.  CNPC controlled each of these subsidiaries during the relevant time.  For example, CNODC is a wholly owned subsidiary of CNPC.  In addition, CNPC shares ownership of CNPC E&D with PetroChina.

22.     PetroChina is a holding company for CNPC.  In that regard, CNPC owned approximately 86-88% of PetroChina's stock and exercised control over all of PetroChina during the relevant time.  CNPC had the right to elect PetroChina's entire board of directors without the concurrence of the other shareholders.  CNPC exercised

that right.  CNPC installed its own directors onto PetroChina's board including CNPC President Jiang Jiemin as PetroChina's Chairman and CNPC Vice-President Duan Wende as executive director of PetroChina.  CNPC also appointed Zheng Hu, Zhoou Jiping, Wang Yilin, and Zeng Yukang, as non-executive directors of PetroChina.  All but Zheng Hu were also CNPC vice-presidents at that time.  Zheng Hu was a former CNPC vice-president.  In public filings, PetroChina has admitted that CNPC controls its policies, management and affairs.  CNPC had the right to determine the outcome of corporate actions without the approval of any minority shareholders.  In addition, CNPC by itself and through its affiliates (including its wholly owned subsidiaries) provided PetroChina with certain services and products necessary for PetroChina's business activities, such as construction and technical services, production services and material supply services.

23.     CNPC has publically admitted that its overseas oil and gas operations are carried out through these subsidiaries.  For example, in the 2003 CNPC annual report, CNPC admits: "CNPC's overseas oil and gas operations are carried out primarily by its wholly-owned subsidiary, the China National Oil and Gas Exploration and Development Corporation (CNODC), and its holding subsidiary, PetroChina Company Limited (PetroChina), in the areas of overseas oil and gas exploration, development, production, refining and chemicals, storage, transportation, and marketing."

24.     Beginning in 2003, CNPC actively sought to acquire all of the interests in the Concession.  CNPC used its wholly owned subsidiary, CNODC, to accomplish these acquisitions.  In 2003, CNODC reached a stock purchase agreement with Cliveden Holdings, Ltd., the parent of Cliveden, whereby CNODC acquired at least 25% of

Cliveden, and by extension a 12.5% working interest in the Concession.[1]   At the same time, CITIC, another Chinese entity, acquired another 25% of Cliveden.

25.     In 2005, CNPC directed CNODC to establish a joint venture with PetroChina called CNPC E&D.  To start the joint venture, CNODC transferred certain assets, including its interest in Cliveden or Cliveden's share of the Concession to CNODC's subsidiary, CNPC E&D.  Specifically, an announcement by PetroChina in June 2005 states that CNODC transferred 100% of its 12.5% working interest in the Concession to CNPC E&D.  Although CNODC only owned the equivalent of a 12.5% working interest by virtue of its purchase of shares in Cliveden, the announcement makes no mention of Cliveden and treats the 12.5% working interest as being owned by CNODC directly. 50% of CNPC E&D was subsequently transferred to PetroChina in exchange for a capital contribution in excess of $2.5 billion.  By virtue of its control over PetroChina and CNODC, CNPC also controlled and directed CNPC E&D.

26.     In early 2006, CNPC, through a subsidiary, acquired the remaining shares of Cliveden and, thus, the remaining interests held by Cliveden in the Concession, all of which was subject to Carlton's 10% carried net profits interest.  All subsequent actions undertaken by Cliveden were under the direct control of CNPC.  Going forward, CNPC and Cliveden were one and the same.

27.     On or about October 1, 2006, CNPC Chad, another indirect subsidiary of CNPC, acquired all of Encana's interest in the Concession by purchasing Encana Chad for over $202,000,000.  Once again, no financial statements were provided to Carlton.

28.     Subsequently in 2006, CNPC E&D having received a conveyance from CNODC and having acquired the Encana's interest through a subsidiary (CNPC Chad) conveyed a

---

[1] As noted in paragraph 18, Cliveden had assigned 50% of the Concession to Encana Chad.

100% interest in an exploration block in Chad to PetroChina.  That block covered an area of 220,000 square kilometers and a trap resource of more than one billion (1,000,000,000) barrels of crude oil.  PetroChina has characterized this block as "one of our most important overseas exploration blocks."  Yet, there is no indication that PetroChina paid any consideration for this conveyance.

29.     In the fall of 2006, CNPC directed its newly acquired subsidiary Cliveden to meet with Carlton and offer to purchase Carlton's net profits interest for $3,000,000.00.  Those funds were be authorized by CNPC.  Carlton declined the offer and opted to wait for production to begin on the Concession and receive its 10 % net profits interest on a quarterly basis as the Assignment Agreement guaranteed.

30.     By the end of 2006, CNPC, through its subsidiaries, acquired all of the remaining equity in the Concession and owned 100% of the interest in the Concession subject to Carlton's 10% carried net profits interest.

31.     At some point CNODC's interests in Cliveden were transferred to CNPC Chad, which had also purchased Encana's interests in the Concession.  CNPC Chad became the direct parent company of Cliveden.  In addition, CNPC Chad became operator of the Concession and most or all of CNPC's Chad based interests.

32.     In 2008, PetroChina acquired the remaining 50% of CNPC E&D from CNPC for $11.8 billion.  CNPC, however, still controlled both PetroChina and CNPC E&D and its subsidiaries through its majority ownership of PetroChina.

33.     In short, by exercising control over all of the actions of CNODC, CNPC E&D, CNPC Chad and PetroChina, CNPC is directly responsible for any liabilities of its subsidiaries regarding Cliveden and the Concession.  The various transfers of Cliveden's

ownership and assets make CNPC, CNODC, CNPC E&D, CNPC Chad, and PetroChina successors to the Assignment Agreement and therefore obligated to provide information and quarterly distributable net profits interest payments to Carlton.

34.    Moreover, despite using its subsidiaries to acquire Cliveden, CNPC publically claims complete ownership and control over both Cliveden and the Concession.  Its own press releases clearly show that CNPC was in control of operating the Concession.  For example, a 2008 news release from the CNPC website claims, "In 2005, we proved the existence of three groups of reservoirs [in Block H, the Concession area]."   That same news release further states, "In December 2003, CNPC signed an agreement with the Swiss company Cliveden to buy shares for the risk exploration of Block H."  The news release further claims, "In 2006, CNPC obtained all of the equity in Block H."

35.    These statements indicate that CNPC Chad either stripped Cliveden and Encana Chad of their assets or completely ignored the corporate existence of Cliveden and Encana Chad by pursuing all transactions related to the Concession on its own behalf. Either way, CNPC Chad has done so at CNPC and PetroChina's control and direction, and CNPC and PetroChina are directly benefiting from the assets owned by Cliveden at the expense of Carlton.

36.    Other public statements and filings support these allegations by highlighting that Cliveden appears nowhere in any public information about the Concession after 2006.  In fact, none of the CNPC annual reports from that period ever reference Cliveden or Encana Chad despite referencing the Concession in multiple parts of the reports even though both Cliveden and Encana Chad owned assets related to the Concessions.  The same goes for CNPC's corporate website.  For example:

- CNPC's website page devoted to its Chad operations indicates that CNPC acquired all of the equity in Block H in Chad via capital and share expansion in 2006.

- CNPC's 2006 Annual Report states, "In 2006, CNPC signed eight petroleum contracts, i.e. the Block H Project in Chad…"

- CNPC's 2006 Annual Report states, "In 2006, we enhanced our exploration in Block H, where we discovered new oil-bearing structures including Baobab and Ronier-1 in the Bongor Basin of the block."

- CNPC's 2007 Annual Report states, "Our risk exploration saw significant progress in Chad, Kazakhstan and Algeria.  A commercial discovery was proven by the first-trial success of formation testing in our Chad project."

- CNPC's 2009 Annual Report claims that CNPC's overseas oil and gas operations conducted testing of well C-2 in Block H of Chad that generated a high output, which further proved the 100-million-ton resources volume at Prosopis-Baobab petroliferous zone.

- CNPC's 2010 Annual Report claims that CNPC's overseas oil and gas operations conducted a formation test that yielded a 1,000 tons per day oil flow from risk exploration well Cassia N-1 in Naramay area of Block H in Chad.

Likewise, in SEC filings, PetroChina publically acknowledges that CNPC E&D conveyed an exploration block in Chad to it in 2006 without mentioning that block had to have belonged to Cliveden and Encana Chad (absent some form of stripping assets or ignoring the separate corporate identities of these entities).  None of these public filings or statements discloses or acknowledges the significant fact that CNPC's interest in the Concession is subject to Carlton's 10% carried net profits interest.

37.     Thus, CNPC controlled and continues to control the operations of the Concession, regardless of the various subsidiaries it directed and used in gaining this control and ownership.

**D.      CNPC invests heavily into the Concession and begins drilling wells.**

38.      Immediately after acquiring Cliveden, CNPC began investing heavily and drilling extensively in the Concession area.  For example, in 2007, CNPC entered into a joint venture with the Chadian Ministry of Petroleum to develop a refinery in N'Djamena to process oil and gas produced in the Concession.  In 2009, CNPC began construction on a 311 kilometer long pipeline in Chad designed to deliver 1,000,000 metric tons annually in the first phase.  The main part of the pipeline was completed by the end of 2010.

39.      CNPC has made a series of public statements indicating they have enjoyed early successes by exploring and drilling into the Concession areas.  In 2007, CNPC reported the first commercial flow from the Concession area.  By the end of 2009, CNPC discovered new reserves in the Concession in the Ronier and Mimosa areas in the Bongor Basin.  Significant progress was also made in the exploration of Prosopis and Baobab.  In 2010, CNPC made key exploration discoveries in Bongor Basin, and achieved a successful formation test in risk exploration well Cassia N-1 deployed in the Naramay area of Block H, which yielded a 1,000 tons per day oil flow.  In 2011, CNPC discovered another hydrocarbon play at Block H in Chad's Bongor Basin.

40.      In 2011, CNPC also completed construction of the N'Djamena refinery, which is designed to process 20,000 barrels of oil per day.  CNPC has begun processing the oil and gas liquids taken from the Concession at the refinery.  In July 2011, CNPC began delivering product from the N'Djamena refinery to the local market.

41.      These public statements establish that CNPC will enjoy an enormous and profitable recovery in the Concession.  These statements also indicate that CNPC has

already profited from its ownership of Cliveden and the Concession at the expense of Carlton.

**E.      Defendants refuse to honor the terms of the Assignment Agreement**

42.      Despite CNPC's public statements confirming that it had drilled wells, successfully recovered oil, and provided product to the local market, no Defendant has provided any of the financial information required under the Assignment Agreement related to Carlton's net profits interest despite Carlton's' demand that they provide such information.  In addition, no Defendant has paid Carlton the agreed upon $500,000 assignor fee as set out in Assignment Agreement, and Cliveden stopped paying the agreed upon $10,000 per month for the support fee, once CNPC purchased Cliveden. This further demonstrates CNPC's control over Cliveden.

43.      In May 2010, Carlton tried to resolve the issue with Cliveden.  Carlton explained in a letter to Cliveden that as a net profits interest owner it had the right to receive reasonable information about the operations.  Without this information, Carlton could not reasonably determine whether it was entitled receive its 10 % net profits interest or if Cliveden had recouped its investment and costs in the Concession and was now obligated to make the $500,000 payment.  In addition, Carlton requested that Cliveden honor the Assignment Agreement and pay the $500,000 fee as well as an additional $490,000, which at the time was the outstanding amount owed for the monthly fee.  In June 2010, Cliveden responded via letter from its Beijing office and again refused to disclose any of the required financial information or pay Carlton its net profits interest payments. Likewise, in November 2010, in a letter from its counsel, Cliveden confirmed its position that Cliveden did not owe any net profits interest to Carlton.

44.     In 2011, CNPC sent lawyers to meet with Carlton.  At the meeting, CNPC's lawyers made an offer to purchase Carlton's interest for far less than its actual value.  To persuade Carlton to accept the amount, CNPC's lawyers informed Carlton that CNPC would never provide Carlton any of the quarterly financial information despite what the Assignment Agreement required.

45.     To date, Defendants have refused to provide any of the quarterly payments or financial information required by the Assignment Agreement.  Defendants have refused to provide any reasonable information to Carlton to allow Carlton to determine the amount of production from the wells in the Concession area or the costs associated with that production.  Even if Defendants assert that no net profits have been realized, Defendants are still obligated to provide financial and production information supporting that assertion.

46.     Publicly released information, however, indicates that CNPC and PetroChina have profited from the Concession beginning in or around 2011, and, thus, owe Carlton its 10% interest of the distributable net profits.  On information and belief, CNPC had drilled approximately 186 wells in the Concession area by 2011.  The wells are producing and the oil is being sent to CNPC's new refinery in N'Djamena, Chad for processing.

47.     If Defendants continue to refuse to pay Carlton its net profits interest share then Carlton stands to lose billons of dollars over the life of the Concession.  The total production from the concession should exceed several hundred thousand barrels per day. Using that figure, the value of Carlton's net profit interest is in excess of $1,000,000,000.00 over the lifetime of the Concession based on the net present value of future cash flows.

16

## VI.    Count 1—Breach of Contract

48.    Carlton repeats and re-alleges the foregoing paragraphs.

49.    The Assignment Agreement is a valid, enforceable contract binding on all Defendants, and as a party Carlton is entitled to sue for its breach. Carlton has met all conditions precedent to and otherwise complied with the Assignment Agreement.

50.    Defendants breached the Assignment Agreement.  Carlton fully performed its obligations under the Assignment Agreement by exchanging its working interest for a net profits interest and providing support and office space for Defendants in Houston, Texas.

51.    Defendants, however, failed to perform.  The Assignment Agreement expressly provided that Defendants were obligated to pay Carlton and provide the relevant supporting financial information on a quarterly basis.  Defendants did neither, thus breaching both their express contractual obligations and their duty as a reasonably prudent operator to account for the revenues from the Concession.  In addition, the Assignment Agreement expressly provided that Defendants would assume the $500,000 debt owed to Carlton by Trinity and that Defendants would pay the debt once all of Cliveden's investment costs were recouped.  Defendants, however, failed to timely repay Carlton after Cliveden had recouped all of its investment costs.  The Assignment Agreement expressly obligated Defendants to pay $10,000 a month to Carlton for the opportunity to receive support and utilize Carlton's office space in Houston.  The Defendants failed to timely pay.

52.    Defendants' conduct constitutes a recurring breach each quarter.

53.     As a direct and proximate result of the Defendants' breach, Carlton suffered the

following damages

- 10% of all net profits received by or that should have been received by Cliveden to date, including any net profits associated with the Encana farmout;

- $500,000 for the Trinity debt that Cliveden assumed; and

- $790,000 in past support and office space payments.

54.     As a result of the Defendants' breach, Carlton retained counsel and seeks

reimbursement for its reasonable attorney fees, as authorized by Tex. Civ. Prac. & Rem.

Code Ann. 38.001.

## VII.     Count 2—Anticipatory Breach of Contract

55.     Carlton repeats and re-alleges the foregoing paragraphs.

56.     In the alternative, Defendants' ongoing refusals to provide information, and their

claims that no payments are required under the Assignment Agreement, amount to an

anticipatory breach of the future quarterly net profits interest payments.

57.     Defendants' anticipatory breach has directly and proximately caused injury to

Carlton, which will result in a loss to Carlton in excess of $1,000,000,000.00 over the

lifetime of the Concession based on the net present value of future cash flows.  For that

reason, Carlton seeks unliquidated damages within the jurisdictional limits of this court.

58.     As a result of the Defendants' breach, Carlton retained counsel and seeks

reimbursement for its reasonable attorney fees, as authorized by Tex. Civ. Prac. & Rem.

Code Ann. 38.001.

## VIII.     Count 3—Fraudulent Transfer

59.     Carlton repeats and re-alleges the foregoing paragraphs.

18

60.     Defendants are liable to Carlton for fraudulently transferring Cliveden's ownership interests and assets in an attempt to keep Carlton from recovering any of the net profits it is owed as a direct result of the Concession.  Upon information and belief, the transfers described above were all undertaken for less than a reasonably equivalent value.  Only Defendants have access to the financial information related to each of the transfers.

61.     Cliveden owned the rights to the Concession, which CNPC and PetroChina have publically admitted was a valuable asset.  Thus, Cliveden's interest and assets would have commanded a reasonable price.  CNPC's Annual Reports from 2007 onward have all claimed extremely successful testing of oil and gas wells in the Concession, which further emphasizes the value of the interests originally held by Cliveden in the Concession.

62.     CNPC and PetroChina, however, have reaped the economic benefits of the Concession rightly belonging to Cliveden by undertaking the business of the Concession under CNPC Chad.  Defendants have accomplished this by stripping Cliveden of its assets, including the Concession and transferring the assets to other CNPC and PetroChina controlled subsidiaries.  The result is that Cliveden lost its most valuable assets and ability to compensate Carlton for its net profits interest.  Numerous public statements from CNPC and PetroChina indicate that they have benefited from assets directly traceable to Cliveden even as every public trace of Cliveden disappeared.

63.     CNPC has either caused Cliveden to transfer its ownership interests and assets to other CNPC entities without fair consideration or simply ignored Cliveden's corporate existence by treating Cliveden's assets and earnings as their own, again usurping

Cliveden's assets without fair consideration and to Carlton's detriment. SEC filings indicate that CNODC transferred a large portion of the Concession to CNPC E&D, which subsequently transferred that block to its then 50% owner PetroChina. Likewise, CNPC's Annual Reports from 2007 onward and its corporate website all show that CNPC claims to have gained all of the equity in the Concession and is operating the Concession as its own asset.

64.     Under the terms of the Assignment Agreement, Carlton would have been entitled to its share of the distributable net profits of any transfer of Cliveden's interests or assets. Cliveden and its successors, however, have taken the position that no net profits are either due or owed.  The only reason Cliveden would have no net profits as a result of these transfers is if Cliveden received less than a reasonably equivalent value for the valuable interests and assets it transferred or CNPC and its subsidiaries are usurping Cliveden's profits attributable to these assets and treating them as their own.

65.     As such, the transfers were fraudulent and made only to prevent, hinder, or delay Carlton from receiving its rightful portion of the net profits associated with Cliveden and the Concession.  The transfers also were made with the intent to keep Carlton from being able to collect a judgment against Cliveden for past and future payments on its net profits interest.  Thus, the transfers violated Tex. Bus. & Com. Code Section 24.005(a)(1) and (2).

66.     By undertaking these fraudulent transfers, Defendants proximately caused injury to Carlton, which resulted in damages identified above.  For that reason, Carlton seeks unliquidated damages within the jurisdictional limits of this court.

67.     Moreover, only CNPC and PetroChina can provide the information on the various capital and share purchases and assets transfers that led to CNPC owning all of the equity in the Concession. Unfortunately, Defendants have refused to make this information available to Carlton despite knowing that Carlton is entitled to such reasonable financial information as a net profits interest owner to determine how much it is owed under the Assignment Agreement.

68.     <u>Exemplary damages.</u> Carlton's injury resulted from Defendants' actual fraud or malice, which entitles Carlton to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).  The manner in which Defendants transferred Cliveden's assets among themselves shows that Defendants intentionally sought to prevent Carlton from identifying the value of its net profits interest or collecting any monies owed.

IX.     <u>Count 4—Oppression</u>

69.     Carlton repeats and re-alleges the foregoing paragraphs.

70.     Defendants' oppressive conduct has substantially defeated the reasonable investment expectations of Carlton, which were both reasonable under the circumstances and central to Carlton's decision to exchange its working interest for a carried net profits interest.

71.     To date, Carlton has not received any payments for its net profits interest as required by the Assignment Agreement and Defendants have explicitly refused to turn over any financial information to Carlton whatsoever.  Upon information and belief, Defendants have made a net profit as defined by the Assignment Agreement, which triggers their duties to pay distributable net profits to Carlton.

72.     Defendants undertook this oppressive conduct to force Carlton to relinquish its carried net profits interest for a fraction of its true value.  This is evident when considering that, in 2006, long before the major discoveries had been made and the true value of the Concession was still speculative, CNPC was negotiating to buy Encana Chad's 50% working interest for over $202,000,000.00, while at the same time it authorized Cliveden to offer to buy out Carlton's 10 percent carried net profits interest for only $3,000,000.00. Carlton's carried net profits interest, however, should have been proportionally even more valuable than the Encana Chad interest because it was not subject to all the same burdens as Encana's working interest.

73.     Later, after both CNPC and PetroChina announced significant reservoir finds and successful test wells and publically admitted the exceptional and increasing value of Concession, CNPC attempted to buy out Carlton's interest for only $5,000,000.00. In an attempt to pressure Carlton into accepting this inadequate offer, they declared that Carlton would never receive the information and documents necessary to determine the value of its interest.

74.     Defendants' oppressive conduct was and is burdensome, harsh, and wrongful, and it further epitomizes a lack of probity and fair dealing, all to the prejudice of Carlton.

75.     Defendants' actions also constitute a visible departure from the standards of fair dealing and a violation of the rules of fair play on which Carlton was entitled to rely.

76.     Defendants wrongfully exerted their control and influence to force their subsidiaries, employees, attorneys, and other agents to cooperate and effectuate this oppression.

77.     Carlton accordingly requests the Court order an equitable buy-out of Carlton's net profits interest in Defendants at enterprise value, as permitted under Texas law.

## X.     Count 5—Unjust Enrichment

78.     Carlton repeats and re-alleges the foregoing paragraphs.

79.     Defendants hold a substantial amount of money that belongs to Carlton in good conscience.  Allowing Defendants to keep the money they should have paid to Carlton under the Assignment Agreement will result in Defendants' unjust enrichment to the detriment of Carlton.

80.     Texas law recognizes a cause of action for money had and received involving the proceeds from a sale.  Here, Carlton seeks the money Defendants have withheld after producing and selling oil from the Concession as well as profiting from the sale or transfer of other Cliveden assets.  Equity and good conscience dictate that Carlton should receive all of this money owed.

81.      Carlton seeks exemplary damages associated with Defendants' continuing retention of those funds.

## XI.     Count 6—Alter Ego

82.     CNPC and PetroChina are jointly and severally liable for the wrongful conduct of all of the other defendants because CNPC, Cliveden, CNODC, CNPC E&D, CNPC Chad, and PetroChina are the alter egos of each other, and the separate corporate identities of these entities should be disregarded, and they should be treated as one entity. From their inception, CNODC, CNPC E&D, PetroChina, and CNPC Chad were organized and operated as mere tools or business conduits of CNPC.  Likewise, after its acquisition in 2006, Cliveden was organized and operated as a mere tool or business

23

conduit of CNPC.  As a result, allowing CNPC to be insulated from liability for the actions of Cliveden, CNODC, CNPC E&D, PetroChina, and CNPC Chad would result in injustice.  Under these circumstances, any corporate/entity fiction should be disregarded. CNPC used these subsidiaries for the purpose of perpetuating and did perpetuate an actual fraud on Carlton primarily for the direct benefit of CNPC.

83.     In support of this claim, Carlton will show the following:

- CNPC owned approximately 86-88% of PetroChina's stock and exercised control over all of PetroChina's actions during the relevant time;

- CNPC had the right to elect PetroChina's entire board of directors without the concurrence of the other shareholders and exercised that right;

- CNPC installed its own directors onto PetroChina's board including CNPC President Jiang Jiemin as PetroChina's Chairman and CNPC Vice-President Duan Wende as executive director of PetroChina;

- CNPC controlled PetroChina's policies, management and affairs;

- CNPC had the right to determine the outcome of corporate actions without the approval of any minority shareholders;

- CNPC by itself and through its affiliates (including its wholly owned subsidiaries) provided PetroChina with certain services and products necessary for PetroChina's business activities, such as construction and technical services, production services and material supply services.

- CNPC owns 100% of CNODC;

- CNPC and PetroChina each own a 50% interest in CNPC E&D, which effectively grants CNPC complete control over CNPC E&D by virtue of its control over PetroChina;

- CNPC admits that it carries out its overseas operations through its subsidiaries such as CNODC and PetroChina;

- As one of CNPC's operating arms, CNODC reached a stock purchase agreement with Cliveden whereby CNODC acquired at least 25% of Cliveden;

- CNPC used CNODC and other subsidiaries to acquire the remaining ownership interests in Cliveden;

- CNPC replaced the leadership of Cliveden with a CNPC executive and relocated Cliveden to Beijing;

- CNPC directed asset transfers of 100% of an exploration block to PetroChina without consideration;

- CNPC created CNPC Chad to carry out its Chad operations and transferred the Cliveden interests from CNODC to CNPC Chad; and

- Despite using its subsidiaries to acquire Cliveden, CNPC publically claims complete ownership and control over both Cliveden and the Concession.

84.     For these reasons, Defendants should be held responsible and jointly and severally liable.

## XII.     Discovery Rule & Fraudulent Concealment

85.     Carlton repeats and re-alleges the foregoing paragraphs.

86.     To the extent necessary, Carlton pleads the discovery rule based on fraud and negligent misrepresentation because the information needed to discover whether Carlton had suffered any harm from Defendants' failure to provide net profits interest payments resulting from the Concession's profitability, including the amounts paid or that should have been paid based on the fraudulent transfers, has been under the sole control of Defendants.  Reasonable diligence could not have uncovered the amount of production and money received by Defendants from the Concession during the relevant time.  Thus, Carlton's harm was inherently undiscoverable.

87.     In addition, to the extent necessary, Carlton pleads fraudulent concealment.  All Defendants had actual knowledge of the Assignment Agreement to pay Carlton a 10% net profits interest.  Likewise, all Defendants had actual knowledge of the overall scheme to breach the Assignment Agreement and commit fraud against Carlton by misrepresenting facts, remaining silent, and transferring Concession assets to other CNPC entities.  Each defendant used deception to carry out this scheme.  Defendants

misrepresented information or purposely remained silent about the amount of net profits owed.  Further, CNPC and PetroChina directed the numerous fraudulent transfers of the Concession property between their subsidiaries to rob Carlton of its net profits interest. Defendants' purpose was simply to avoid paying Carlton for the rights it held under the Assignment Agreement.  Carlton reasonably relied upon the initial representations made by the Defendants during the scheme because Carlton expected that Defendants would need some time to develop the Concession area into a profit producing enterprise.

### XIII.   Accounting

88.   Carlton repeats and re-alleges the foregoing paragraphs.

89.   Carlton requests an accounting for the purpose of determining the true amount owed on its net profits interest.  The Assignment Agreement expressly permits Carlton to have access to reasonable financial information allowing it to determine how Defendants calculated its net profits interest payments.  This request is particularly important given Defendants' intransigence towards providing any of the required financial information to Carlton.  Moreover, because of Defendants' obstinacy, Carlton requests access to all financial data, including all electronically stored information ("ESI"), related to the Concession.  This data is necessary to determine the extent of the breach and fraud committed by Defendants.

90.   Carlton has made a prior written request for these books and records in accordance with Texas law.  All conditions precedent have occurred.  If Defendants refuse to produce the requested documents Carlton will seek entry of a temporary injunction ordering the production of all financial data and ESI.  Plaintiff Carlton also requests reasonable attorney's fees.

XIV.   <u>Constructive Trust</u>

91.     Carlton repeats and re-alleges the foregoing paragraphs.

92.     Carlton requests a constructive trust be imposed on the working interest that Carlton assigned to Defendants.  That assignment was procured by fraud and now Defendants stand to be unjustly enriched through that fraud.  A constructive trust should be imposed to return the interest and all outstanding profits associated with that interest back to Carlton.

XV.   <u>Jury Demand</u>

93.     Carlton demands a trial by jury on all issues except the equitable remedies sought.

XVI.   <u>Prayer</u>

94.     For the foregoing reasons, Carlton asks for a judgment against Defendants for the following:

    a.     All actual damages;

    b.     Exemplary damages;

    c.     Prejudgment and post-judgment interest;

    d.     An equitable buy-out;

    e.     Court costs;

    f.     Attorney's fees;

    g.     An accounting

    h.     Imposition of a constructive trust; and

    i.     All other relief to which Carlton is entitled.


Respectfully submitted,


*/s/ John E. Williams, Jr.*

Attorney-In-Charge
Williams Kherkher Hart Boundas LLP
State Bar No. 21600300
Southern District No. 5179
8441 Gulf Freeway, Suite 600
Houston, TX 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: jwilliams@williamskherkher.com

Jack Carnegie
Attorney-In-Charge
Strasburger & Price, L.L.P
State Bar No. 03826100
Southern District No. 1630
909 Fannin Street, Suite 2300
Houston, TX 77010
Telephone:  (713) 951-5673
Facsimile:  (832) 397-3524
Email: jack.carnegie@strasburger.com

Gregory N. Jones
Of Counsel
Williams Kherkher Hart Boundas LLP
State Bar No. 10889450
Southern District No. 2352
8441 Gulf Freeway, Suite 600
Houston, TX 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: gjones@williamskherkher.com

E. Armistead Easterby
Of Counsel
Williams Kherkher Hart Boundas LLP
State Bar No. 00796500
Southern District No. 20598
8441 Gulf Freeway, Suite 600
Houston, TX 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: aeasterby@williamskherkher.com

Elizabeth B. Kamin
Of Counsel
Strasburger & Price, L.L.P

State Bar No. 02620900
Southern District No. 7417
Strasburger & Price, LLP
909 Fannin Street, Suite 2300
Houston, TX 77010
(713) 951-5600 Telephone
(713) 951-5660 Facsimile
Email: betsy.kamin@strasburger.com

Sean H. McCarthy
Of Counsel
Williams Kherkher Hart Boundas LLP
State Bar No. 24065706
Southern District No. 987779
8441 Gulf Freeway, Suite 600
Houston, TX 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: smccarthy@williamskherkher.com

**ATTORNEYS FOR CARLTON
ENERGY GROUP, L.L.C**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on <u>April 29</u>, 2013, I electronically filed the foregoing document with the clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  A copy of the foregoing document was served on all counsel of record via the Court's ECF system.

*/s/ Sean H. McCarthy*